**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 200284-U

Order filed November 30, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| In Re: The Commitment of<br>JONATHAN C. WEST, | )<br>)<br>)<br>) | Appeal from the Circuit Court<br>of the Ninth Judicial Circuit,<br>Knox County, Illinois, |
| (The People of the State of Illinois,<br>    Petitioner-Appellee, | )<br>) | Appeal No. 3-20-0284<br>Circuit No. 16-MR-80 |
| v. | )<br>)<br>) | |
| Jonathan C. West,<br><br>    Respondent-Appellant). | )<br>)<br>)<br>)<br>) | Honorable<br>Scott S. Shipplett,<br>Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Daugherity and Justice Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   (1) The evidence was sufficient for the trial court to find the respondent to be a sexually violent person subject to commitment in a secure treatment facility; (2) the trial court did not abuse its discretion or commit reversible plain error by admitting and considering expert testimony regarding the respondent's possession of an electronic storage devise containing images of young boys; and (3) respondent's trial counsel was not ineffective for failing to object to the admission of such testimony.

¶ 2        Following a bench trial, the trial court found Respondent-Appellant, Jonathan C. West, to be a sexually violent person subject to commitment under the Sexually Violent Persons Commitment Act and committed him to a secure facility of the Illinois Department of Human Services until further order of the court.  West appeals from the trial court's judgment.

¶ 3                                                FACTS

¶ 4        On August 15, 2015, the State filed a petition seeking a determination that West is a sexually violent person under the Sexually Violent Persons Commitment Act (the Act), 725 ILCS 207/1, *et seq.* (West 2014) and the commitment of West to the custody of the Illinois Department of Human Resources (the Department) for treatment at a secure facility until such time as West is no longer considered to be a sexually violent person.

¶ 5        The Act's definition of a "sexually violent person" includes a person who is convicted of a sexually violent offense or adjudicated delinquent for such an offense and who is dangerous because he suffers from a mental disorder that makes it substantially probable that he will engage in acts of sexual violence.  725 ILCS 207/5(f) (West 2014). The Act defines a "mental disorder" as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence."  725 ILCS 207/5(b) (West 2014). Sexually violent persons may be committed to the custody of the Department for control, care, and treatment until the person is no longer a sexually violent person.  725 ILCS 207/40.

¶ 6        In 2006, West was adjudicated delinquent for committing acts of aggravated criminal sexual abuse on his guardian's seven-year-old nephew. At the time of the offense, West was 15 years old, one month short of his 16th birthday. West waited until his guardian was away, then masturbated and performed oral sex on the boy and forced him to reciprocate.  The boy's nine-

year-old brother reported that West committed similar offenses against him. West was sentenced to five years of probation.

¶ 7    In 2008, while spending the night at another's home, West fellated and "dry humped" a six-year-old boy. West was 18 years old at that time.  Two years later, when West was 20 years old, he pleaded guilty to predatory criminal sexual assault and was sentenced to nine years' imprisonment.

¶ 8    West's bench trial consisted primarily of the testimony of four expert witnesses, two of whom were called by the State and two by West.  Each expert based his diagnosis on the criteria set out in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition (DSM-5). The experts identified the following diagnostic criteria for pedophilic disorder:

> (A) Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 or younger);
>
> (B) the individual has acted out these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty; and
>
> (C) the individual is at least 16 years of age and at least five years older than the child or children in Criterion A.

¶ 9    Dr. Robert Brucker, a licensed clinical psychologist, licensed sex offender evaluator, and licensed sex offender risk assessment evaluator, testified for the State.  Dr. Brucker was qualified to testify as an expert in the areas of clinical psychology and evaluation and sex offender risk assessment.

¶ 10    Dr. Brucker diagnosed West with pedophilic disorder. He also diagnosed antisocial personality disorder; alcohol use disorder, and cannabis use disorder. Dr. Brucker stated that he

had reviewed West's master file, which included his criminal history, court documents, police reports, treatment records, and disciplinary history. Dr. Brucker testified that these are the types of records reasonably relied upon by experts in his field. Dr. Brucker also conducted a three-hour clinical interview with West. Dr. Brucker testified that, during that interview, West acknowledged he was sexually attracted to both of the boys he molested. He told others that he had an erection while committing the offenses. Although West initially denied having any current sexual attraction to prepubescent boys, he later admitted that he still occasionally will have a sexual arousal to children, "maybe two times a year." Dr. Brucker found this to be "relevant diagnostically because that suggests that the sexual arousal to children is still present, which is usually the case because *** sexual arousal to children doesn't tend to just go away or stop." According to Dr. Brucker, West further acknowledged that, when he sees children on the television, he sometimes changes the channel because he does not want his sexual arousal to children to come back.

¶ 11    Dr. Brucker opined that West satisfied the diagnostic criteria for pedophilic disorder because he showed sexual interest in prepubescent boys over a period longer than six months, as demonstrated by his offenses against the seven-year-old boy in 2006 and the six-year-old boy in 2008. Dr. Brucker acknowledged that the DSM-5 diagnostic criteria provide that the "individual needs to be at least 16 years old," and that West was just under 16 years old during his first sex offense. However, Dr. Brucker testified that the DSM-5 directs clinicians not to "us[e] the manual as a cookbook" and view the diagnostic criteria rigidly. Accordingly, Dr. Brucker concluded that, although West was approximately 30 days shy of his 16th birthday when he first assaulted a child in 2006, that offense nonetheless could support his pedophilia diagnosis,

4

particularly because West exhibited the same behaviors into adulthood, as evidenced by his assault against a child in 2008.

¶ 12    In assessing West's risk of reoffending, Dr. Brucker conducted an adjusted actuarial risk assessment. West's score on one test, the Static-99R, placed him in the highest risk category. Over 99% of people score lower than West did on that test; his score placed him in a group that is 5.9 times more likely than the typical sex offender to commit future sex offenses. West's score on another test, the Static-2002R, placed him in that measure's highest risk category. Because the Static-99R and Static-2002R do not consider "all of the known empirically-founded risk factors," Dr. Brucker also considered the effect of those additional risk factors on West's risk of reoffending. Dr. Brucker identified a half dozen such factors that further increase West's risk of reoffending, and he determined that no potential protective factor, such as successful completion of sex offense-specific treatment, a debilitating medical condition, or advanced age applied to reduce West's risk of reoffending.

¶ 13    Dr. Brucker opined, to a reasonable degree of psychological certainty, that: (1) West had been convicted of a qualifying sexually violent offense; (2) West is dangerous to others because he suffers from several diagnosed mental disorders, including pedophilic disorder; (3) these congenital or acquired conditions which affect West's emotional or volitional capacity and predispose him to commit future acts of sexual violence; and (4) West is substantially probable — meaning much more likely than not — to commit future acts of sexual violence.

¶ 14    On cross-examination, Dr. Brucker agreed that West had reported to one of his own experts that he had offended against the 2008 victim once and denied that he was attracted to or had fantasies about young boys. West initially told Dr. Brucker that his sexual fantasies involved adults, and he initially denied experiencing arousal to children. However, when asked whether he

ever saw children on TV and "need[ed] to turn the channel or get aroused," West "looked down, and acknowledged he continues to sometimes have an arousal to prepubescent children." West told Dr. Brucker that "when he see[s] them, [he] just click[s] the channel. When asked why he feels the need to change the channel, West responded that he did not "want any of that coming back"; "it's wrong," and "it should never have happened." West acknowledged that he still sometimes is attracted to both male and female children and that "when [he] start[s] to get aroused or find them attractive, [he] turn[s] the channel because [he does not] want to go back to that." West stated that stated that this had happened "maybe two times" over the past year.

¶ 15        Dr. David Suire, a licensed clinical psychologist employed by the Department, also testified for the State. Dr. Suire was qualified to testify as an expert in the areas of sex-offender evaluation and risk assessment. Dr. Suire reviewed the available records, including police reports, mental health records, prior expert reports, and records from the Illinois Department of Corrections and from a treatment and detention facility where West had been treated. He also interviewed West. During the interview, West admitted committing the 2006 and 2008 sexual offenses. With respect to the first offense, West acknowledged that he had molested the seven-year-old boy between five and 10 times over several months. With respect to the 2008 offense, the Department of Children and Family Services (DCFS) concluded that "there was evidence to support the belief" that West had also offended against the boy's nine-year old brother.

¶ 16        Applying the DSM-5 criteria, Dr. Suire diagnosed West with "pedophilic disorder, sexually attracted to males, non-exclusive type." He also diagnosed borderline personality disorder and antisocial personality disorder. According to Dr. Suire, these mental disorders are congenital or acquired conditions that affect West's emotional or volitional capacity and predispose him to commit acts of sexual violence.

¶ 17     Dr. Suire opined that West satisfied the diagnostic criteria for pedophilic disorder because he was convicted of sexually assaulting two boys, and DCFS had concluded that West likely sexually assaulted a third boy. In each case, the victim was under 13. Although West was younger that 16 at the time of the 2006 offenses, Dr. Suire considered those offenses as qualifying behavior for his diagnosis because the 2008 offense showed that West's sexual attraction to boys was "not transient." In addition, West acknowledged to Drs. Brucker and Suire that he had a sexual attraction to children. Moreover, West had experienced difficulties resulting from his pedophilic urges and actions, particularly the criminal consequences of his acts. Dr. Suire further opined that the fact that West had molested his 6-year-old victim in a "high-risk situation" demonstrated the intensity of his urges and his difficulty in controlling them.

¶ 18     Dr. Suire further noted that, while at the treatment and detention facility, West was discovered with an SD card (an electronic storage device) that contained "images of young boys." According to Dr. Suire, this further confirmed West's sustained interest in children, and the fact that West possessed these images in a facility where they were likely to be discovered demonstrated his difficulty in controlling his urges. However, during cross-examination, Suire acknowledged that he had not seen these images but had only read about them while reviewing West's "Master Treatment Plan" in preparation for trial. Suire testified that the master treatment plan "didn't really say exactly what [the images] were, but Dr. Suire assumed that they were not pornographic because "had they been pornographic or involved sexual contact *** they would typically note that." Because the master treatment plan merely referred to images of "young boys" without identifying the ages of the boys depicted, Dr. Suire did not know whether the boys were prepubescent or just young.

7

¶ 19     Dr. Suire further testified that, because he lacked access to the images on the SD card, he did not rely upon them when formulating his opinion that West met the qualifications for a sexually violent person.  Dr. Suire stated that none of his opinions were "predicated on the SD card."

¶ 20     Dr. Suire testified that pedophilic attraction is generally persistent.  The DSM indicates that pedophilia is typically a lifelong condition.  Although West sometimes denied a recurrent interest in children, the DSM provides that one need not acknowledge one's sexual interest in children for the diagnosis to apply.  Dr. Suire concluded that West had a "very strong" "sexual attraction to underaged boys that he has had a great deal of difficulty controlling, particularly when he's outside of a secure setting."

¶ 21     Dr. Suire conducted a risk assessment that began with actuarial measures. West's scores on the Static-99R and the Static-2002R placed him in the highest risk category. Dr. Suire explained that actuarial measures underestimate a sex offender's risk of reoffending because they are time limited and do not capture uncharged sexually violent offenses, such as West's alleged offense against a 9-year-old boy (as reported by DCFS).  Dr. Suire identified a dozen additional empirical risk factors that increased a respondent's risk of re-offense. He considered whether treatment progress, advanced age, or ill health applied to reduce West's risk of reoffending and concluded that they did not. West's age remained an aggravating factor on the actuarial assessments, and he had made no progress in sex offender treatment.  (West had participated in treatment-readiness groups, but he declined to participate in treatment until his commitment proceedings and related legal issues were settled.)  Based on his risk assessment, Dr. Suire opined, to a reasonable degree of psychological certainty, that West is substantially probable to

reoffend, meaning much more likely than not, and that he satisfied the criteria for commitment as a sexually violent person.

¶ 22    Dr. Luis Rosell, a clinical psychologist, testified for West as an expert qualified in the areas of clinical psychology, sex-offender diagnosis, and sex-offender risk assessment. Dr. Rosell diagnosed West with post-traumatic stress disorder, alcohol use disorder, and cannabis use disorder. However, he did not diagnose West with pedophilic disorder. Dr. West opined that West's 2006 offense should not be treated as a qualifying offense for purposes of the DSM-5's third criteria for diagnosing pedophilic disorder because (1) West was younger than 16 when he committed the 2006 offense, and (2) when he committed that offense, West may have been "sexually reactive" due to the sexual abuse he had suffered as a child.

¶ 23    Rosell further opined that, if the 2006 offense is excluded, West would not satisfy the first criteria outlined in the DSM-5 because it could not be shown that West had recurrent sexually arousing, fantasies, urges, or behaviors involving activity with a prepubescent child for a period of six months. Dr. Rosell noted that there was no information as to any such fantasies, urges, or behaviors between the 2006 offense and the 2008 offense.

¶ 24    However, Dr. Rosell acknowledged that "there's no clear explanation or caveat within the DSM what to do" where a respondent was not quite 16 when he committed his first documented offense against a child and was over 16 when he committed his second offense "a couple of years later" Rosell conceded that one could conclude — and in fact, other experts had concluded — that because a respondent committed the first offense near his 16th birthday and committed the other offense after his 18th birthday, his urges persisted between those two offenses.

¶ 25    On cross-examination, Dr. Rosell agreed that West may satisfy the diagnostic criteria for pedophilic disorder, that the deviant interest is life-long, and that individuals who deny attraction

9

to children may nonetheless be diagnosed with pedophilic disorder. He further agreed that West displayed numerous traits, such as a diagnosed conduct disorder, failure to conform to social norms, deceitfulness, impulsivity, irritability and aggression, that would qualify him for an antisocial personality disorder diagnosis, and that persons with both antisocial personality disorder and pedophilic disorder are more likely to act out sexually with children. Dr. Rosell also conceded that persons with substance abuse problems may be likely to act out with children. However, Dr. Rosell "felt that there may not be enough evidence" to warrant a diagnosis of pedophilic disorder in this case because, if each of West's offenses were taken independently, West would not satisfy the requisite six-month period of persistent urges. Accordingly, Dr, Rosell "did not feel comfortable making that determination." Dr. Rosell opined that, if West had committed his first offense one month later than he did (*i.e.*, after he had turned 16), "there wouldn't have been an argument" against a diagnosis of pedophilic disorder.

¶ 26    Dr. Rosell also testified regarding the "movies of young boys" that were allegedly found on an SD card in West's possession at the treatment and detention facility. Dr. Rosell could not determine from the record what kinds of movies these were. However, Dr. Rosell opined that the images were likely not "illegal" because he "would have assumed" that the issue would arise in treatment records if they were. He further noted that people in detention and treatment facilities who are found in possession of child pornography "usually get charged" for the offense. Moreover, the records that Dr. Rosell reviewed contained no mention of the incident other than the single reference in the initial master treatment plan, which had been prepared approximately two years before the trial. When West was referred to the detention facility's behavior committee for his possession of the SD card, the committee's summary did not describe the

10

card's contents. Moreover, although the two-year-old master treatment plan referenced the incident, it was not mentioned in a subsequent master treatment plan prepared in 2019.

¶ 27 Dr. Rosell further testified that, when he asked West about the statement he had made to Brucker that he would change the channel on his television to avoid seeing images of children, West explained that he did so not because he was sexually attracted to them, but "to keep himself in check and manage and kind of issues that may occur." Dr. Rosell opined that West's behavior in changing channels was consistent with what sex offenders are taught in treatment. Dr. Rosell testified that West's channel-changing behavior had no impact on Dr. Rosell's professional judgment that West should not be diagnosed with pedophilic disorder.

¶ 28 Dr. Rosell conducted a risk assessment and determined that West scored in the "well above average range" on both the Static-99R and Static-2002R. Nevertheless, Dr. Rosell did not believe that West was substantially probable to reoffend because: (1) "the great majority of individuals do not recidivate even though we believe they all do"; (2) West had been confined for his adult life; and (3) West "voluntarily wanted to help himself as much as possible," as evidenced by his participation in treatment at the treatment and detention facility. During cross-examination, Dr. Rosell acknowledged that, although the Static-99R coding manual directs that a "prudent evaluator would always consider other external factors such as dynamic or changeable risk factors," Dr. Rosell did not do so. Dr. Rosell opined that considerations of such additional factors, other than the factor of an offender's non-compliance with supervision, "really add nothing beyond the [S]tatic [evaluations]."

¶ 29 Dr. Mark Kuzia, a licensed clinical psychologist, testified for West as an expert qualified in the areas of clinical psychology, sex-offender diagnosis, sex-offender treatment, and sex-offender risk assessment. Dr. Kuzia opined that West did not have a mental disorder and

11

therefore was not subject to commitment under the Act. He concluded that West could not satisfy the diagnostic criteria for pedophilic disorder because he was not yet 16 years of age at the time of the first offense. Kuzia opined that, at that age, West's offending behavior might have causes other than pedophilic disorder. For example, Dr. Kuzia opined that West could have been reacting to sexual abuse he suffered as a child or "working through potential issues related to sexual identity, or gender identity, or sexual orientation." Dr. Kuzia further opined that, without more evidence of qualifying fantasies, urges, or behaviors, the single offense that West committed in 2008 cannot meet the requirement that West had recurring pedophilic fantasies, urges, or behaviors for a period of at least six months. Although Dr. Kuzia acknowledged that West "may" have a sexual interest in children, he noted that in the majority of the reports, West "does not indicate" arousal to, or fantasies or urges regarding, children.[1]

¶ 30      Dr. Kuzia testified that the SD card incident added nothing meaningful to his evaluation of West due to the lack of adequate information about the incident. The fact that West possessed movies involving young boys might be relevant if "the children were naked," but not necessarily if they were merely popular movies involving children. Dr. Kuzia noted that he would have expected that there would be more information about the incident in West's records if the images on the SD card were pornographic or involved nude children.

¶ 31      Kuzia did not conduct a risk assessment because he did not diagnose West with a mental disorder.

¶ 32      On cross-examination, Dr. Kuzia agreed that he had completed only 5-10 evaluations at the time he evaluated West. He conceded that the DSM permits a diagnosis of pedophilic

---

[1] Dr. Kuzia did not diagnose West with antisocial personality disorder because West had not acted out while in IDOC or Department custody.

12

disorder if there is "clinical evidence of sustained persistence of sexual attraction to children even if the six-month duration cannot be precisely determined." He admitted that West's behaviors were similar in both offenses. Dr. Kuzia acknowledged that he could not rule out that West was attracted to his victims specifically, but he also could not rule out that West was "attracted to gender and he didn't really know how to express that because he's a teenage boy, and he's learning about his sexuality."

¶ 33    The trial court found that West is a sexually violent person subject to commitment under the Act and ordered him to be committed for control, care and treatment in a secure facility. In reaching its verdict, the trial court made the following statements about the SD card incident:

> "And one of the things that I -- that I really thought was -- and maybe I shouldn't put as much weight on it because nobody else seemed to care all that much is the -- having a flash drive in his pocket in the treatment facility with movies of young boys. Now, maybe Mr. West is a Disney fan, and it was the Bad News Bears, and, you know, who doesn't like the Bad News Bears, right? But I really don't know, but it seems to me that surreptitiously and against the rules, carrying a flash drive with movies of young boys on it is alarming to me as a layperson as to why that is not even to be considered as part of your later reflection of whether or not he has a mental disorder by the Drs. Rosell and Kuzia. I -- I just find it very incredible that they did not give that any weight at all."

¶ 34    West moved for a reversal of the trial court's judgment or, in the alternative, for a new trial. He argued that the evidence was insufficient to prove that he had a mental disorder or that there was a pattern of behavior lasting for six months or more to support a diagnosis of pedophilic disorder. Following argument, the trial court denied West's motion.

13

¶ 35    This appeal followed.

¶ 36                                ANALYSIS

¶ 37                        1.  Sufficiency of the Evidence

¶ 38    West argues that the trial court erred in finding that he is a sexually violent person subject to commitment under the Act.  He maintains that the trial court's finding was against the manifest weight of the evidence because the State failed to prove beyond a reasonable doubt that he suffered from pedophilic disorder or from any other qualifying mental disorder.

¶ 39    When reviewing claims challenging the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt. *In re Commitment of Fields*, 2014 (IL) 115542, ¶ 20; *In re Detention of Welsh*, 393 Ill. App. 3d 431, 454 (2009).  To establish that West was a sexually violent person under the Act, the State had to prove beyond a reasonable doubt that (1) West was convicted of a sexually violent offense; (2) he has a mental disorder; and (3) the mental disorder makes it substantially probable that he will engage in acts of sexual violence. 725 ILCS 207/5(f), 35(d) (West 2014); *Fields*, 2014 (IL) 115542, ¶ 20.  West does not dispute that he was convicted of a sexually violent offense. He argues only that the State failed to establish that he has a mental disorder, and thus failed to meet its burden of proof on the second and third elements.

¶ 40    As noted above, the DSM-5 provides the following criteria or the diagnosis of pedophilic disorder: (A) recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children "[o]ver a period of at least 6 months"; (B) the individual has acted out these sexual urges, or the sexual urges or fantasies cause marked

14

distress or interpersonal difficulty; and (C) the individual is "at least 16 years of age" and at least five years older than the child or children in Criterion A.

¶ 41    West argues that the evidence was insufficient to prove that he suffered from pedophilic disorder under these criteria. Specifically, West contends that the 2006 offense cannot be considered for diagnostic purposes because he was not yet 16 years old at the time he committed that offense. (He was one month short of his 16th birthday.) West further maintains that, when the 2006 offense is excluded, the State could not establish that he had "recurrent" fantasies, urges, or behaviors involving sexual activity with a prepubescent child or children "[o]ver a period of at least 6 months" because the State could prove only that West committed a single offense in 2008.

¶ 42    The State's experts, Drs. Brucker and Suire, rejected these conclusions. Dr. Brucker opined that West satisfied the diagnostic criteria for pedophilic disorder because West showed sexual interest in prepubescent boys over a period longer than six months, as demonstrated by his offenses against the seven-year-old boy in 2006 and against the six-year-old boy in 2008. Dr. Brucker acknowledged that the DSM-5 diagnostic criteria provide that the "individual needs to be at least 16 years old," and that West was just under 16 years old during his first sex offense. However, Dr. Brucker testified that the DSM-5 directs clinicians not to "us[e] the manual as a cookbook" by viewing the diagnostic criteria rigidly. Accordingly, Dr. Brucker declined to find that West failed to satisfy the diagnostic criteria for pedophilic disorder merely because he was not 30 days older when he committed the first offense. He noted that West's pedophilic behaviors continued into 2008, when he was more than 16 years old.

¶ 43    In further support of his diagnosis, Dr. Brucker testified that West had told him during an interview that he was sexually attracted to both of the boys he molested. Although West initially

15

denied having any current sexual attraction to prepubescent boys, he later admitted that he still occasionally will have a sexual arousal to children, "maybe two times a year." West further acknowledged that, when he sees children on the television, he sometimes changes the channel because he doesn't want his sexual arousal to children to come back. Dr. Brucker found this to be diagnostically relevant because it suggests that West's sexual arousal to children is still present. Dr. Brucker observed that this is usually the case for pedophiles because "sexual arousal to children doesn't tend to just go away or stop."

¶ 44        Dr. Suire also diagnosed West with pedophilic disorder according to the DSM-5 criteria. Dr. Suire opined that West satisfied the diagnostic criteria because he was convicted of sexually assaulting two boys, and DCFS had concluded that West had likely sexually assaulted a third boy. In each case, the victim was under 13. Although West was younger that 16 at the time of the 2006 offenses, Dr. Suire considered that offense as qualifying behavior for his diagnosis because the 2008 offense showed that West's sexual attraction to boys was "not transient." Dr. Suire further noted that West had admitted to him that he had sexual attraction to children, which he had also admitted to Dr. Brucker. Dr. Suire also testified that pedophilia is a persistent condition.

¶ 45        Dr. Suire opined that West's pedophilic disorder is a congenital or acquired condition that affected West's emotional or volitional capacity and predisposed him to commit acts of sexual violence. He testified that West had experienced difficulties resulting from his pedophilic urges and actions, particularly the criminal consequences of his acts. Dr. Suire further opined that the fact that West had molested his 6-year-old victim in a "high-risk situation" demonstrated the intensity of his urges and his difficulty in controlling them.

16

¶ 46    Drs. Brucker and Suire each conducted a thorough and detailed assessment of West's risk of reoffending. Based on their assessments, each expert opined that West is substantially probable to reoffend, meaning much more likely than not, and that he satisfied the criteria for commitment as a sexually violent person.

¶ 47    West's medical experts, Drs. Rosell and Kuzia, each opined that West could not satisfy the criteria for diagnosing pedophilic disorder because he was not yet 16 years of age at the time of the first offense and because West's offending behavior might have causes other than pedophilic disorder. Each doctor concluded that, without more evidence of qualifying fantasies, urges, or behaviors, the single offense that West committed in 2008 cannot meet the requirement that West had recurring pedophilic fantasies, urges, or behaviors for a period of at least six months.

¶ 48    However, Drs. Rosell and Kuzia each made admissions that undermined their conclusions and bolstered the State's case. Dr. Rosell acknowledged that "there's no clear explanation *** within the DSM what to do where a respondent was not quite 16 when he committed his first documented offense against a child and was over 16 when he committed his second offense a couple of years later." He conceded that one could conclude — and in fact, other experts had concluded — that because a respondent committed the first offense near his 16th birthday and committed the other offense after his 18th birthday, the respondent's urges persisted between those two offenses. Similarly, Dr. Kuzia conceded that the DSM permits a diagnosis of pedophilic disorder if there is "clinical evidence of sustained persistence of sexual attraction to children even if the six-month duration cannot be precisely determined." He admitted that West's behaviors were similar in both offenses, and acknowledged that he could not rule out that West was attracted to his victims specifically. Further, Dr. Rosell admitted that West may satisfy the diagnostic criteria for pedophilic disorder, that the deviant interest is life-long, and that

17

individuals who deny attraction to children may nonetheless be diagnosed with pedophilic disorder.

¶ 49    Moreover, Dr. Rosell diagnosed West with alcohol use disorder and cannabis use disorder, and he testified that West exhibited certain personality traits that would qualify him for a diagnosis of antisocial personality disorder diagnosis. Dr. Rosell noted that individuals suffering from both antisocial personality disorder and pedophilic disorder are more likely to act out sexually with children, as are those who suffer from substance abuse problems. Although Dr. Rosell did not believe that it was substantially probable that West would reoffend, he testified that West scored in the "well above average range" on both the Static-99R and Static-2002R in the risk assessment he conducted.

¶ 50    Accordingly, there was ample evidence justifying the trial court's finding that West had pedophilic disorder and that he satisfied the criteria for commitment as a sexually violent person. Although Drs. Rosell and Kuzia, declined to diagnose West with pedophilic disorder–based largely on their conclusion that the 2006 offense was not a qualifying offense because West was not 16 at the time–the trial court was entitled to credit the opinions of Drs. Brucker and Suire over those of Drs. Rosell and Kuzia. As the trier of fact, it is the trial court's role to resolve conflicting testimony by assessing the credibility of the witnesses and determining the weight to be accorded their testimony. *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 979 (2006); see also *In re Detention of Welsh*, 393 Ill. App. 3d 431, 457 (2009). We will not substitute our judgment for that of the circuit court on these matters. *Id.* at 980; see also *Welsh*, 393 Ill. App. 3d at 457 (holding that, although the expert witnesses disagreed as to the defendant's diagnosis, "it was the trial court's function to weigh the evidence and resolve conflicts therein"); *In re*

*Detention of Lieberman*, 379 Ill. App. 3d 585, 603 (2007); *In re Detention of Cain*, 402 Ill. App. 3d 390, 397 (2010).

¶ 51    As noted above, Dr. Rosell's and Dr. Kuzia's opinions are premised in large part on their conclusion that West's 2006 offense may not be considered under the DSM-5 because West was not yet 16 at that time.  However, Dr. Brucker testified that a diagnosis of pedophilic disorder should be based on a consideration of the entire "clinical picture" and that the DSM-5's criteria should not be applied rigidly "like a cookbook."  Relying on similar expert testimony, our supreme court held that an offense committed when a respondent was 15 years old could be considered for purposes of diagnosing pedophilic disorder.  *Fields*, 2014 (IL) 115542, ¶¶ 24-26 (rejecting respondent's argument that the State failed to prove that he had pedophilic disorder because an offense he committed when he was 15 years and 8 months old could not be considered, where the State's experts explained why the offense should be considered under the DSM criteria).  In light of the opinions of Drs. Brucker and Suire, and the admissions made by West's own experts, we find no reason to disturb the trial court's finding that that West is a sexually violent person subject to commitment under the Act.

¶ 52                    2.  Admission of the SD Card Evidence

¶ 53    West further argues that the trial court abused its discretion by admitting and substantially relying upon the fact that West possessed an electronic storage device containing images of "young boys" while he was in the Department's custody. West argues that, because the report of this alleged incident contained no information about the types of images involved (*i.e.*, whether they were pornographic or not) or about the ages of the boys depicted, West argues that this evidence was incompetent and substantially more prejudicial than probative. West argues that we should reverse the trial court's verdict on this basis and remand for a new trial.

19

¶ 54    A reviewing court will reverse a trial court's ruling on the admissibility of evidence only where the ruling constitutes an abuse of discretion. *In re Commitment of Doherty*, 403 Ill. App. 3d 615, 621 (West 2010). A trial court's ruling on an evidentiary issue will be considered an abuse of discretion only if it is unreasonable, arbitrary, or where no reasonable person would take the same view as the court. *In re Commitment of Anderson*, 2014 IL App (3d) 12104911, ¶ 15; *In re Detention of Ehrlich*, 2012 IL App (1st) 102300, ¶ 75. Furthermore, even if the trial court has committed an abuse of discretion in the admission of evidence, it will not warrant a reversal of the trial court's judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial. See *People v. Jackson*, 232 Ill. 2d 246, 265 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 55    West did not object when the evidence at issue was presented to the trial court. The issue was therefore forfeited. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). West urges us to review the issue for plain error. The plain error rule allows us to reach a forfeited error that affects substantial rights and to reverse the trial court's judgment on that basis where: (i) the evidence is so closely balanced that the verdict might have resulted from the error and not the evidence; or (ii) the error is so serious that the defendant was denied a substantial right and, thus, a fair trial. *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 56; *People v. Gladney*, 2020 IL App (3d) 180087, ¶ 19.

¶ 56    We find no reversible plain error in this case. The parties dispute whether the evidence regarding the electronic storage devise was admitted as substantive evidence or merely to explain the basis of the State's experts' opinions. However, even assuming *arguendo* that the trial court abused its discretion by admitting the evidence and by considering it as substantive evidence, reversal would not be warranted. Given the overwhelming evidence presented by the State's

20

experts and the damaging admissions made by West's experts, West has not, and cannot, show that the admission of the evidence regarding the SD card caused him substantial prejudice affecting the outcome of the trial. Although the trial transcript reflects that the court relied, in part, on West's possession of the electronic storage device, it shows that the court relied to a far greater extent on its careful consideration of the four expert opinions and its assessment of each opinion's credibility and weight. Moreover, one of the State's experts (Dr. Suire) testified that he did not rely upon the images on the SD card when formulating his opinion that West met the qualifications for a sexually violent person.

¶ 57      Thus, West cannot show either that the evidence was closely balanced in this case or that the admission of evidence regarding the electronic storage device deprived him of a substantial right or a fair trial.

¶ 58                          3.  Ineffective Assistance of Counsel

¶ 59      Finally, West argues that he received ineffective assistance of counsel because his attorney failed to object to testimony regarding electronic storage device. To prevail on a claim of ineffective assistance of counsel, the claimant must prove both that counsel's conduct fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *People v. Howery*, 178 Ill. 2d 1, 51 (1997); *In re Commitment of Dodge*, 2013 IL App (1st) 11360, ¶ 20. If a respondent was not prejudiced by the allegedly incompetent conduct of his attorney, this court may rule on the claim without first finding that the attorney's conduct constituted less than reasonably effective assistance. *People v. Cooper*, 132 Ill. 2d 347, 359. (1989).

¶ 60      As noted above, West cannot establish that the admission of the evidence at issue caused him substantial prejudice affecting the outcome of the trial. Accordingly, West's counsel's

21

failure to object to the admission of this evidence cannot form the basis of a claim for ineffective assistance of counsel.

¶ 61                                    CONCLUSION

¶ 62        For the reasons set forth above, we affirm the judgment of the circuit court of Knox County.

¶ 63        Affirmed.